FILED
2021 Apr-21  AM 09:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

|  |  |
|---|---|
| KELVIN MOORE (AIS # 00207941),<br>          *Plaintiff,*<br><br>     v.<br><br>JEFFERSON DUNN, CHARLES DANIELS, MATTHEW BRAND, EDWARD ELLINGTON, ARNALDO MERCADO, KARLA JONES, ERROL PICKENS, NEKETRIS ESTELLE, ANTHONY BROOKS, GARY MALONE, CARLA GRAHAM, KEVIN WHITE, KENNETH ROBERTSON, WILLIE MCLEMORE, and DARRYL ROBINSON,<br><br>          *Defendants.* | CASE NO. _____ |

## **COMPLAINT**

Plaintiff Kelvin Moore, through the undersigned counsel, brings this action pursuant to Section 1983 of Title 42 of the United States Code against Commissioner Jefferson Dunn, Associate Commissioner Charles Daniels, Associate Commissioner Matthew Brand, Institutional Coordinator Edward Ellington, Arnaldo Mercado, St. Clair Correctional Facility Warden Karla Jones, Former Assistant Warden Errol Pickens, Neketris Estelle, Anthony Brooks, Gary Malone, Lt. Carla Graham, Kevin White, Lt. Kenneth Robertson, Sgt. Willie McLemore, and Darryl Robinson, all of

whom are employees of the Alabama Department of Corrections (the "ADOC"), a public entity, and also believed to be current or former employees or agents of the ADOC or other departments of the State of Alabama, and alleges as follows:

## INTRODUCTION

1.     On the night of May 25, 2019 at St. Clair Correctional Facility ("St. Clair"), Defendant McLemore, under the direct supervision of Defendant Robertson, locked Dion Williams (AIS #278291) in Moore's cell despite the fact that Williams was not Moore's assigned cellmate and was assigned to an entirely different block within the prison. Later that evening, Williams brutally stabbed Moore at least twelve times in his face, throat, shoulders, back, and legs.

2.     Before Moore was stabbed, Defendant Robertson questioned Williams in connection with multiple stabbings that had occurred earlier in the day. Afterwards, on information and belief, without exonerating Williams of the stabbings, Robertson simply returned Williams to his cellblock without even searching him for weapons. The on-duty officers in N and O block (including Defendants Robertson, Robinson, and McLemore) permitted Williams to freely move to Moore's cellblock, N block, where he proceeded to stab several inmates.

3.     After Williams stabbed multiple people in N block, Defendants McLemore and Robertson placed it into lockdown, requiring all inmates to return to their cells. Instead of returning to his own cellblock (in line with lockdown

2

protocols), Williams entered Moore's cell. During the lockdown, certain Correctional Officer Defendants (including Defendants Robertson, McLemore, and Robinson) conducted numerous bed checks to determine whether inmates were in the correct location. Using their cell rosters, these Defendants confirmed that Williams did not belong in Moore's cell. Despite knowing that Williams was in the entirely wrong cellblock, these Defendants did not relocate Williams to his proper location.

4.     Although it was Williams' violence that precipitated the lockdown of N block, the Correctional Officer Defendants did not take reasonable steps to protect other inmates from Williams' attacks. They did not search Williams for weapons (or even ask if he had any contraband) or inquire into the reasons he was in the wrong place, nor did they return him to his cellblock upon learning that he was in the wrong place during a lockdown.

5.     The Supervisory Defendants likewise refused to enact and oversee the implementation of policies and procedures that would have prevented Williams' attack, despite knowing of the unchecked violence at St. Clair.

6.     Because of Defendants' safety and security failures, Moore became Williams' final stabbing victim of the day. Williams repeatedly beat Moore over the head and then stabbed him at least a dozen times, seriously injuring him.

7.     As Williams was attacking him, Moore repeatedly pushed his prison cell's emergency panic button which connected to the "cube" where Defendant Robinson oversaw the inmates. When no help came, Moore began screaming for help and banging on his cell door. There was still no response from Robinson or any other Correctional Officer Defendant. Other inmates began to yell for help and bang on their doors in response to Moore's cries. But still, no help came.

8.     Several minutes passed before Defendant Robertson finally arrived and opened Moore's cell, while Moore was still locked in his cell with Williams. Moore collapsed outside, bleeding profusely, and was carried to the prison infirmary. Moore was then airlifted to the University of Alabama at Birmingham hospital ("UAB") because of the seriousness of his injuries.

9.     Moore's injuries included major damage to his lungs and knees and he narrowly avoided significant damage to his jugular vein. He also suffered multiple facial fractures and one of his teeth was broken off. Moore has had six teeth removed as a result of the attack and continues to suffer problems with his vision. Moore was later diagnosed with Post Traumatic Stress Disorder ("PTSD"). He continues to suffer substantial emotional and physical effects from the attack and aftermath, including poor appetite, loss of sleep, nightmares, panic attacks, and weight loss.

10.     Stabbing attacks like the ones recounted above are not abnormal at St. Clair. Violence was, and continues to be, rampant and unmitigated at St. Clair. As

detailed in a report issued by the Department of Justice (the "DOJ Report") in April 2019, within St. Clair and other ADOC men's prisons, there is "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." *See* DOJ Report, attached as Exhibit A,  at 2. In the fiscal year ending in September 2018, St. Clair reported a homicide rate of over 300 homicides per 100,000 incarcerated people, which is over 60 times the national average homicide rate for state prisons from 2001 to 2016. Even this rate is likely low due to the ADOC's practice of underreporting. *Id.* at 1, 3, 11-12 (describing instances where ADOC inaccurately reported homicides as "natural" deaths).

11. By the time Williams attacked Moore in May 2019, the Defendants were on notice that the inmates they were charged with protecting were at an unreasonable and preventable risk of violence. Through their employment with the ADOC, Defendants personally witnessed the severe inmate-on-inmate violence at St. Clair or were otherwise informed of the violence. In 2014, inmates housed at St. Clair brought a class action which detailed the safety and security failings at St. Clair. *See* Class Action Complaint, attached as Exhibit B. On September 6, 2018, the Equal Justice Initiative ("EJI") sent Defendant Dunn a letter warning him about the substantial risk of harm in the violent "hot bay" where Moore was housed and urged immediate action. And just under two months before the attack on Moore, the DOJ Report, concluding that the ADOC violates the constitutional rights of the

inmates it houses by failing to protect them from violent incidents exactly like this one, was sent to the ADOC (including directly to Defendant Dunn and Defendant Jones). *See* Ex. A at 55.

12.    Despite this notice, none of the Defendants took appropriate action to reasonably ensure Moore's safety from the unreasonable threat of violence posed by the systemic issues at St. Clair. Instead, the Supervisory Defendants failed to implement and/or oversee the implementation of reasonable security procedures, failed to properly classify and house prisoners, ineffectively managed the prison and provided inadequate training, and failed to sufficiently staff St. Clair with adequate correctional officers. All Defendants failed to stop or at least mitigate inmate possession of weapons within the prison, prevent unauthorized roaming throughout the facility by prisoners, reasonably oversee the prison and inmates, and adequately address and discipline inmate-on-inmate violence.

13.    Not only did Defendants fail to take action to alleviate the substantial risk of serious harm posed to Moore because of St. Clair's failings, Defendants McLemore, Robinson, and Robertson also failed to prevent the specific threat of serious harm to Moore posed by Williams, despite awareness of the risks. On information and belief, Defendant Robertson was aware of, or at least suspected, Williams of violent attacks earlier the same day, but did not take reasonable steps to protect Moore. Defendants Robinson, McLemore, and Robertson failed to protect

Moore from an unreasonable risk of violence by failing to remove Williams from Moore's cell or search him for weapons, despite knowledge that there had been multiple other stabbings that day and that Williams was not assigned to Moore's cell. Defendants Robinson, McLemore, and Robertson also unreasonably delayed providing assistance to Moore, despite hearing Moore's calls for help.

14.     Defendants' failures led directly to Moore's stabbing and the serious injuries he suffered therefrom and violated Moore's constitutional right to reasonable safety. Moore thus brings this suit.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. §§ 1983 and 1988. This Court also has jurisdiction over Moore's state law claims under 28 U.S.C. § 1367.

16.     Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b). The claims alleged herein arise from an incident at St. Clair, an adult correctional facility located in Springville, Alabama that is part of the ADOC. Because the events and omissions giving rise to Moore's claims occurred in the Northern District of Alabama, venue is proper here.

## PARTIES

17.     Plaintiff Kelvin Moore is an inmate in the custody of the ADOC. At all times relevant to this action, Moore was, and still is, an inmate at St. Clair.

18.     Defendant Commissioner Jefferson Dunn is a resident of the state of Alabama and was at all times relevant hereto the Commissioner of the ADOC. As Commissioner of the ADOC, Defendant Dunn is responsible for overall operation of the ADOC and each institution under its jurisdiction, including St. Clair. Through those duties, Dunn is responsible for the management and staffing of prison facilities, as well as the safety and security of all inmates incarcerated within the ADOC. The constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent and direction of Defendant Dunn, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by his actions or by his deliberate indifference and failure to act. Defendant Dunn is sued in his individual capacity.

19.     Defendant Charles Daniels was at all times relevant hereto employed as Associate Commissioner for Operations and Institutional Security for the ADOC. As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for ensuring the effective and safe daily operations of prison facilities, including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division. Defendant Daniels is sued in his individual capacity.

20.    Defendant Matthew Brand is a resident of the State of Alabama. At all times material hereto, Defendant Brand was employed by ADOC as the Associate Commissioner for Administrative Services. In this role, Defendant Brand is responsible for the training, development, and education of ADOC's workforce. Defendant Brand is sued in his individual capacity.

21.    Defendant Edward Ellington is a resident of the State of Alabama and was the Institutional Coordinator for the Northern Region of the ADOC at all times relevant hereto. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, including St. Clair. His duties included supervising the wardens of St. Clair, ensuring effective and safe daily operations at St. Clair, and leading the external security audit team. Defendant Ellington was also responsible for serving as the liaison between St. Clair Prison and the ADOC Executive Leadership. Defendant Ellington is sued in his individual capacity.

22.    Defendant Arnaldo Mercado was at all times relevant hereto the Chief Law Enforcement Officer of the ADOC Law Enforcement Services. As the Chief Law Enforcement Officer, Defendant Mercado was responsible for all criminal investigations, including the investigation into assaults and homicides at St. Clair, as well as Williams' attacks. Defendant Mercado is sued in his individual capacity.

23.     Defendant Karla Jones was at all times relevant hereto the Warden of St. Clair and an employee of ADOC. As warden, Defendant Jones was responsible for the day-to-day operations of St. Clair, the safety and security of all inmates at St. Clair, and the supervision of all subordinate employees. Defendant Jones' responsibilities also included ensuring adequate supervision and monitoring of inmates, adequate classification of inmates, appropriate housing assignments for inmates, adequate staffing levels, appropriate discipline and deterrence of inmate and staff misconduct, adherence by staff to St. Clair and ADOC protocols, adequate implementation of protocols and procedures to protect inmates from violence, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and any other security device necessary for safety and security. Defendant Jones is sued in her individual capacity.

24.     Defendant Errol Pickens was at all times relevant hereto an Assistant Warden of St. Clair and an employee of ADOC. As Assistant Warden, Defendant Pickens was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees. Specifically, Defendant Pickens' oversight responsibilities included contraband searches, staffing levels, safety procedures and protocols (implementation and oversight), investigations into inmate and employee misconduct, reviews of such investigations, or both, inmate movement, and safety and security during certain

shifts. In March 2020, Defendant Pickens was demoted to Correctional Captain based on multiple violations of ADOC policies. Defendant Pickens is sued in his individual capacity.

25.    Defendant Anthony Brooks was at all times relevant hereto an Assistant Warden of St. Clair and an employee of ADOC. As Assistant Warden, Defendant Brooks was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees. Specifically, Defendant Brooks' oversight responsibilities included contraband searches, investigations into inmate and employee misconduct, reviews of such investigations, or both, inmate movement, and safety and security during certain shifts. Defendant Brooks is sued in his individual capacity.

26.    Defendant Neketris Estelle was the Head of Classification at St. Clair at all times relevant hereto. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; reclassifying prisoners for segregation if their disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing

11

assignment requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners. Defendant Estelle is sued in his/her individual capacity.

27.    Defendant Gary Malone was at all times relevant hereto, and on information and belief still is, assigned as Security Captain at St. Clair. As Captain, Defendant Malone is responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees. Defendant Malone's duties also include authorizing all housing assignments at St. Clair. Defendant Malone is sued in his individual capacity.

28.    Defendant Kevin White was a Captain at St. Clair at all times relevant herein. As Captain, Defendant White was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees. Defendant White is sued in his individual capacity.

29.    Defendant Carla Graham was at all times relevant hereto, and on information and belief still is, assigned as Security Captain at St. Clair. Defendant Graham is responsible for the day-to-day supervision of the correctional staff and ensuring the safety of inmates and staff at St. Clair. Defendant Graham is sued in her individual capacity.

30.    Defendant Willie McLemore was at all times relevant hereto assigned as a Correctional Sergeant at St. Clair. As sergeant, Defendant McLemore was

responsible for overseeing the on-duty correctional officers and for initiating and declaring the institutional lockdown on the night Moore was stabbed. Defendant McLemore is responsible for locking Williams in Moore's cell prior to the stabbing. Defendant McLemore is sued in his individual capacity.

31.    Defendant Kenneth Robertson was at all times relevant hereto, and on information and belief still is, assigned as a Correctional Lieutenant at St. Clair. Defendant Robertson was assigned as the night-shift commander on May 25-26, 2019. Defendant Robertson, in his capacity as shift commander, was responsible for ensuring that all duties, security measures, and administrative procedures were followed. As Lieutenant, Defendant Robertson was responsible for coordinating shift activities and security procedures, including ensuring inmates were in their proper housing location. Defendant Robertson is sued in his individual capacity.

32.    Together, Defendants Dunn, Daniels, Brand, Ellington, Mercado, Jones, Pickens, Brooks, Estelle, Malone, White, Graham, Robertson, and McLemore are referred to as the "Supervisory Defendants."

33.    Defendant Darryl Robinson was at all times relevant hereto, and on information and belief still is, a correctional officer at St. Clair. Defendant Robinson was the night-shift officer assigned to be the "cube operator" on the night Moore was stabbed. As cube operator, Defendant Robinson was responsible for monitoring the emergency "panic" light from his control panel in the cube. The light is engaged

only when an inmate presses an emergency button located just beside the door of his cell. Additionally, it was Defendant Robinson's responsibility to monitor N block on the night Moore was stabbed. Defendant Robinson is sued in his individual capacity.

34.     Together, Defendants McLemore, Robertson, and Robinson are referred to as the "Correctional Officer Defendants."

35.     All Defendants were acting within the scope of their employment at the times of the incidents giving rise to the causes of action. All defendants have acted and continue to act under the color of law in the State of Alabama at all times relevant to this Complaint. Their deprivations of Moore's constitutional rights are set forth in the following statements of facts and causes of action.

## GENERAL ALLEGATIONS

### A.   The Attack on Moore.

36.     Moore was the final victim in a string of stabbings that took place at St. Clair on May 25, 2019. Following a grisly stabbing in a block N stairwell (not the first such stabbing of the day), Defendants Robertson and McLemore initiated lockdown procedures in block N. During a lockdown, all prisoners are required to return to their assigned cells. In response to this lockdown, Moore entered his cell for the night.

37.     Williams, who was not assigned to block N, entered Moore's cell. Defendant McLemore, despite knowing Williams' identity and correct cell assignment, locked him in with Moore.

38.     During the lockdown, but before Moore was stabbed, Defendants Robertson and McLemore conducted multiple bed roster checks, intended to ensure all inmates are in the proper locations. Each time, these Defendants identified that Williams did not belong in Moore's cell, or even in block N, but did not make him return to his own cell.

39.     On information and belief, it is against St. Clair's policy and ADOC regulations for a prison inmate to remain in a housing block to which he is not assigned, especially when a prison is in a heightened security state such as a lockdown, but it is common practice for correctional staff to ignore the policy.

40.     Defendants McLemore and Robertson together disregarded the policy, allowed Williams to remain in Moore's cell, and continued with their roster count.

41.     Defendants McLemore and Robertson did not search Williams for weapons or contraband, nor did they question him concerning his involvement in the earlier stabbings. On information and belief, Defendants McLemore and Robertson were aware of and/or involved in an ongoing investigation into Williams' involvement in other stabbings earlier that day.

42.     Defendant Robertson, who is believed to be responsible for night-shift security protocols, chose not to utilize a roving officer during the night and instead assigned only a single corrections officer, Defendant Robinson, to oversee both the N-1 and N-2 housing units overnight from a cubicle between the two units. As a result, no correctional officers were present in the housing area overnight.

43.     At some point during the night, Moore leaned over, and without provocation—or even communication—Williams hit Moore hard over the head while Moore was bent over.

44.     Stunned, Moore began to look up, but was greeted with a second blow to the head. Williams then began stabbing Moore with a prison-made knife and an ice pick that Defendants McLemore and Robertson or any of the other Correctional Officer Defendants would have found and confiscated had they searched Williams.

45.      Moore began screaming and pressing the emergency panic button in his cell repeatedly. There was no response from the assigned corrections officer, Defendant Robinson, or any other Correctional Officer Defendant.

46.     Several minutes passed without any response while Williams continued to attack Moore. Unable to flee or otherwise protect himself from the assault, Moore continued to call for help, including by banging on his cell door.

47.     Inmates in other cells in Moore's cellblock heard Moore's screams and also banged on their doors and yelled for help.

48.     While Moore desperately waited for help, Williams continued to stab Moore.

49.     In total, Moore was stabbed at least twelve times, with wounds spanning the length of his body—including his face, throat, shoulders, back, and legs.

50.     After several minutes, Defendant Robertson finally opened the door to Moore's cell. Moore crawled out, bleeding heavily.

51.     Defendant Robertson and three inmates carried Moore to the infirmary, where he was evacuated by helicopter to UAB.

52.     Moore suffered injuries to his lungs and narrowly avoided significant damage to his jugular vein. The force of the stab wounds to his face caused fractures to the anterior and lateral walls of his left maxillary sinus and left orbital rim, and one of his upper molars was broken off, which Moore accidentally swallowed. Moore ultimately had six teeth removed and continues to have problems with his vision as a result of the attack.

53.     Moore was hospitalized at UAB following the assault. For at least two weeks after the attack, Moore used a wheelchair to get around, because the wounds to his lower body made bearing weight excruciating.

54.     Moore was diagnosed with PTSD following the attack and remains in constant pain. Moore continues to have difficulty sleeping due to recurring

nightmares, suffers from a loss of appetite, panic attacks, and requires regular therapy. He is prescribed medication to treat anxiety and depression.

### B. Moore Was the Final Victim of Williams' Daylong Rampage of Violence.

55.     On information and belief, in the early afternoon of May 25, 2019, Williams, armed with a prison-made knife and ice pick, began behaving erratically and threatening other inmates in the O housing block. Williams appeared to be intoxicated. Based on information and belief, correctional officers overseeing O block, including Officer Taylor Watts,[1] saw or would have seen Williams' behavior just by scanning the housing block, but no officer intervened, tested Williams to determine his sobriety, searched him for weapons, or cut off his access to other areas of the prison.

56.     On information and belief, an inmate attempted to walk past Williams in the O housing block. Williams stabbed him.

57.     On information and belief, around 2:30 p.m., Williams called another inmate over to where he was standing and stabbed him multiple times. The inmate suffered wounds just two inches away from his spine and very close to his spleen.

---

[1]   On information and belief, Officer Watts passed away in June 2019 and is not named as a defendant in this lawsuit. Nevertheless, Moore includes relevant factual information regarding Officer Watts' involvement here.

On information and belief, Officer Watts and other correctional officers observed Williams' confrontation with the inmate from the cubicle.

58.    On information and belief, the inmate did not report the assault for fear of retribution by Williams and concern that he would be placed in segregated housing. Instead, he called his mother and asked her to report the assault. On information and belief, his mother called St. Clair and was told that her son was "fine." The inmate was eventually transported to a hospital to treat his stab wounds.

59.    On information and belief, certain Correctional Officer Defendants, including Defendant Robertson, suspected Williams was the assailant in the O block stabbings and pulled him aside to speak with him. After briefly questioning Williams, the Defendants returned him to his cellblock and permitted him to interact with other inmates without searching him or his cell for weapons or other contraband.

60.    Despite observation of Williams' behavior in the O block, there were no additional security measures imposed, and Williams was able to travel freely between O block and N block after violently assaulting at least two people.

61.    In N block, Williams encountered an inmate named John McCarley (AIS #318428) in the stairwell just outside of Moore's cell. McCarley was on his way to see Moore, with whom he had been speaking about GED classes. McCarley was blindsided when Williams stabbed him in the chest. McCarley fought back, and

Williams continued to stab him until McCarley attempted to flee. He was unable to escape, collapsing at the bottom of the stairwell from his wounds.

62.    No Correctional Officer Defendant intervened in Williams' attack on McCarley or took steps to protect other inmates from Williams. Several inmates dragged McCarley to a cell next to the stairwell where he collapsed again. No Correctional Officer Defendant came to McCarley's aid or took control of Williams.

63.    When McCarley regained consciousness, he saw blood "pulsating" from the stab wounds in his chest. On information and belief, correctional officers saw McCarley lying on the prison floor but refused to assist him. Two inmates then carried McCarley to the infirmary, from which he was airlifted to UAB. Once there, he required six hours of open-heart surgery to save his life.

64.    On information and belief, immediately after Williams stabbed McCarley, another inmate looked down the stairwell and saw McCarley staggering from his wounds.

65.     The inmate hurried down the stairs and bumped into Williams, who stabbed him once in the right shoulder and twice in the back. No Correctional Officer Defendant intervened in Williams' attack on the inmate or took steps to protect other inmates from Williams.

66.    Meanwhile, Moore was sitting in his cell, located near the stairwell where the stabbings occurred.

67.     After the stabbings on the N block stairwell, Defendant McLemore finally announced that the N housing block was being put into lockdown, requiring inmates to return to their assigned cells.

68.     Moore followed this order and remained in his cell.

69.     Williams, who was assigned to a cell in block O-2, entered Moore's cell instead of returning to his cellblock. At the time, Moore had no reason to believe Williams was responsible for the earlier stabbings.

70.     During the subsequent roster count, Defendants McLemore and Robertson confirmed that Williams was not in the proper cell, or even cellblock. In spite of the fact that Williams had already been questioned that day in connection with one stabbing and was now located within feet of the site of two more stabbings, these Defendants agreed to allow him to remain in Moore's cell and did not search him for weapons. Within hours, Moore became Williams' final victim of the day.

**C.     The Ubiquitous Violence and Security Failures at St. Clair Precipitated the Attack on Moore.**

71.     St. Clair is reputed as one of the most dangerous prisons in the nation. Despite the shocking nature of Williams' assault on Moore, Moore's experience is not unique. Rather, it is emblematic of the widespread violence and abuse rampant within St. Clair's walls.

72.     Long before and through the time of Moore's stabbing, St. Clair has been overcrowded and short-staffed. *See* Ex. A at 8-9.

21

73.     The failure to address the staffing and overcrowding by the Supervisory Defendants resulted in inadequate supervision and monitoring of inmates and engendered conditions posing an unreasonable risk of serious harm to inmates, including to Moore. Further, correctional officer staff took advantage of the top-down failings, by racking up overtime pay while treating their oversight duties as an afterthought. *Id.* at 10 ("[S]taffing prisons with exhausted staff [from working overtime] makes for ineffective and . . . potentially life-threatening outcomes.").

74.     The ineffective monitoring allows, among other things, inmates to easily have the time and space to create their own weapons and use them against other prisoners without being caught. Further, without attentive and sufficient correctional officers with clear policies and procedures in place, inmates frequently gain access to unauthorized locations (including other cellblocks) and use their self-made weapons to commit violent acts without intervention.

75.     On information and belief, St. Clair's problems with violence are and have been especially severe in housing blocks N and O,[2] which are referred to as "hot bays" by inmates and, informally, by prison staff, including the Defendants. A "hot bay" is a term used for housing units where a large proportion of inmates have

---

[2]     On or around May 6, 2019, all inmates housed in the P and Q blocks were transferred to the N and O blocks, which were previously vacant.

had disciplinary problems and are commonly known to be prone to inmate-on-inmate violence.

76.    The reported violence at St. Clair increased sharply beginning in 2010. In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

77.    On information and belief, the actual number of inmate-on-inmate assaults is much higher than the reported rate, given the unreliability of ADOC's reporting. Even using the underreported statistics, the number of reported assaults has grown at an astonishing rate: 59 in 2011; 78 in 2012; 101 in 2013; 127 in 2014; 157 in 2015; 249 in 2016; 132 in 2017; 163 in 2018; and 65 through Moore's attack at the end of May 2019.

78.    In 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system. The same year, St. Clair had the highest per capita homicide rate of all of the men's prisons in Alabama.

79.    In the months leading up to Moore's attack, at least three men were killed as a result of assaults that took place in whole or in part in the N and O blocks at St. Clair.

80.    The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation.

81.     The following paragraphs are a non-exhaustive summary of the violent attacks at St. Clair leading up to Moore's attack from 2017 to May 2019, many occurring in the N and O blocks (formerly the P and Q blocks):

(a)     In January 2017, an inmate was assaulted by two men in a day room in Q block within sight of the warden. The inmate was stabbed in the left temple.

(b)     In February 2017, a prisoner was stabbed nine times by three other inmates who came into his cell and attacked him.

(c)     In March 2017, two prisoners were seen by officers stabbing another inmate from behind while the victim was on his way to the dining hall. The attack continued despite the officers' instructions to stop.

(d)     In April 2017, two men were hospitalized with stab wounds after a knife fight. Another inmate was left in a coma as a result of a stabbing.

(e)     In May 2017, fifteen prisoners were stabbed in a large, violent incident.

(f)     In July 2017, an inmate was murdered, found by staff tied to a bedpost with strangulation marks on his neck. Another inmate was also killed that month and at least five others were stabbed. Officers also observed a knife fight in P block but did not intervene.

(g)     In August 2017, an inmate was stabbed in his own cell after confronting another prisoner about stealing his property. At least three other stabbings occurred that month in P block.

(h)     In September 2017, a St. Clair inmate was beaten by two prisoners with a sock filled with metal locks. Due to the severity of his injuries, the inmate was transported to an outside hospital for emergency treatment.

(i)     In September 2017, two prisoners were fighting with box cutters and homemade knives. A third prisoner approached while one of the fighting prisoners was being escorted to the infirmary and he was stabbed in the back. While officers were trying to subdue the stabbing inmate, another prisoner approached and tried to stab him with a knife.

(j)     In October 2017, an attack was only discovered after St. Clair staff found an inmate in the prison yard wearing only a blanket and socks. The inmate had been assaulted and severely beaten. He was bound and taped around his hands, ankles, mouth, and head and had fresh burn marks on his face. A different prisoner was held hostage in his cell and assaulted by another inmate for two days. Three other inmates were stabbed in two separate incidents and another inmate's throat was slit in the O housing block after an inmate improperly gained access to the housing unit.

(k)     In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. Another prisoner was raped at knifepoint, another was stabbed, and the assailant was allowed to escape from correctional officers without recovery of the weapon. Two prisoners fought

with large machete-like weapons while three officers watched but did not intervene.

(l)     In December 2017, an inmate was stabbed sixteen times in the entry to the P and Q blocks. Another was stabbed in his back, knees, and legs. Another was stabbed twelve times in the arm, side and back, in the view of an officer who did not intervene. Another prisoner was stabbed four times. Another was assaulted by an inmate with a metal pole.

(m)    In January 2018, an inmate was stabbed multiple times in his cell in O block by multiple assailants.

(n)    In February 2018, an inmate was murdered during a knife fight involving another prisoner who had an extensive history of being disciplined for possessing knives and had been involved in a different knife fight at another facility. Another stabbing was only discovered after a prisoner was found running down the hall with a knife in his head.

(o)    In March 2018, an inmate was stabbed in the P and Q block hallway while the prison was on lockdown and the knife was protruding from his body when he was found. Another prisoner was stabbed in the chest in Q block and at least six other stabbings occurred.

(p)    In April 2018, an inmate was stabbed thirteen times during a knife fight in P block. Another was stabbed in front of the gym.

(q)    In May 2018, a prisoner was held hostage by four other prisoners and was sexually assaulted. Officers simply asked how many men were inside when they conducted counts. Another inmate was stabbed in his sleep in Q block. Another was stabbed outside of Q block because the assailants believed that the victim had provided staff with information about another stabbing.

(r)    In July 2018, three inmates beat another inmate with a belt buckle and attempted to sexually assault him. Another inmate was stabbed by multiple inmates for refusing to move from his own cell. At least six other prisoners were stabbed in the P and Q blocks that same month. Another prisoner's throat was slit while a correctional officer observed the attack.

(s)    In August 2018, an inmate was stabbed over twenty times in the P and Q block hallway in view of a correctional officer who did not intervene. Another was stabbed ten times. Another was stabbed and left lying in the dayroom of P block for approximately 30 minutes without assistance. At least seven other prisoners were stabbed that month.

(t)    In September 2018, a man was killed with deep stab wounds to the neck, left back, and right back resulting from an altercation in the P and Q blocks. The prisoner had previously been stabbed in July 2017 while incarcerated at St. Clair.

(u)     That same month, another inmate was stabbed in the dayroom in the P block and eventually died while in restricted housing.

(v)     In October 2018, a prisoner was stabbed by several men in a cell in Q block.

(w)     In November 2018, a prisoner was stabbed in the P and Q block common area by an intoxicated prisoner who was acting erratically before the assault.

(x)     In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in P block.

(y)     In January 2019, an inmate was sexually assaulted at knifepoint in an extortion attempt. The victim informed several officers, but given their lack of action, he resorted to hiding from his assailants in the classification office. Another inmate was stabbed in the neck, requiring helicopter transportation to a hospital for his injuries. Yet another inmate was assaulted and held captive by an inmate unofficially sharing his cell in P block.

(z)     In February 2019, in Q block, an inmate was stabbed by another inmate who was intoxicated on methamphetamine, which required transportation to UAB for treatment. Another inmate was murdered after reporting to officers that he feared for his safety.

(aa)   In March 2019, an inmate required hospitalization after being stabbed in Q block.

(bb)   In April 2019, Williams was in a violent altercation after he told an inmate sleeping in his cell in Q block that he needed to leave so Williams and his assigned cellmate could sleep in the cell.

(cc)   In early May 2019, an inmate was assaulted in P block resulting in transport to a nearby hospital for treatment.

82.   On information and belief, between November 2015 and Moore's stabbing on May 25, 2019, there were at least 147 assaults on inmates at St. Clair that included weapons, an average of at least one violent assault every 8.8 days for over three years. The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation. This figure does not include assaults that were improperly reported or undiscovered, which are believed to be significant.

**D.   Defendants Were Aware of the Pervasive Inmate-On-Inmate Violence at St. Clair.**

83.   Each of the Defendants had knowledge of the substantial risk of serious harm facing prisoners like Moore at St. Clair—particularly in the N and O housing blocks—based on their personal observations, the DOJ Report, the EJI Letter, press coverage of incidents at St. Clair, ADOC Investigations & Intelligence division, duty

officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, and/or prisoner lawsuits.

84.     The Supervisory Defendants have known about the deprivation of inmates' rights since at least October 13, 2014, when a class action was filed against former ADOC Commissioner Kim Thomas and other St. Clair officials, detailing the conditions at St. Clair. *See* Ex. B. Defendant Gary Malone was named as a defendant in that case and Defendant Dunn was substituted into the case when he assumed his position as ADOC Commissioner in 2015.

85.     The named plaintiffs in the class action alleged "mismanagement, poor leadership, overcrowding, inadequate security, and unsafe conditions . . . ha[d] led to an extraordinarily high homicide rate, weekly stabbings and assaults, and a culture where violence is tolerated," which created conditions of confinement violating the Eighth and Fourteenth Amendments. Ex. B at 2.

86.     The class action plaintiffs further contended that ADOC and St. Clair officials had failed to promulgate, implement, and enforce the policies, procedures, and practices necessary to (a) adequately supervise and monitor the housing units and common areas and (b) maintain the safety and security of St. Clair inmates. *Id*. ¶ 26. And with respect to the formal policies and procedures that were in place, St. Clair correctional staff failed to appropriately follow them with impunity.

87.     In addition, the plaintiffs pointedly noted that prisoners were at risk of violence due to the defendants' failure to adequately enforce housing assignments and monitor inmate movement. *Id.* ¶¶ 26-28.

88.     In support of their claims, the class action plaintiffs supplied statistics revealing the atypically high rate of stabbings and serious assaults at St. Clair. For example, the rate of fights and assaults at St. Clair was 4,321 per 100,000 prisoners from January to May 2014. *Id.* ¶ 13. This number, however, then nearly doubled to 7,680 per 100,000 prisoners from June 2014 to March 2015. *Id.* The abnormally high rate of assaults and fights continues to this day.

89.     Prior to filing the suit, counsel for the named plaintiffs sent a letter to then-Commissioner Thomas in April 2014 to flag the alarming rise in violence at St. Clair and later met with Commissioner Thomas to underscore these concerns. *Id.* ¶ 8. Only around a month and a half later, after yet another murder of a St. Clair inmate, plaintiffs' counsel was prompted to send a second letter to Commissioner Thomas, again documenting and recounting the unusually high rate of violence and number of homicides at St. Clair. *Id.*

90.     In November 2017, the parties in the class action reached a settlement in which ADOC promised to implement multiple reforms, such as installing video cameras for security monitoring. But ADOC did not follow through on its promise, forcing the parties to return to mediation in 2018. Then, on July 31, 2020, the parties

submitted a joint request to stay the action in order to continue negotiating a (second) resolution. Joint Mot. to Stay/Extend Stay, *Duke v. Dunn*, No. 4:14-cv-01952-VEH-JHE (N.D. Ala. July 31, 2020), Dkt. 194. Thus, Defendants here, including Defendants Dunn and Malone, were aware of the ongoing and pervasive security issues for at least several years prior to the attack on Moore.

91.    In the midst of this ongoing litigation, in a December 2015 interview, Defendant Dunn remarked that St. Clair "stood out" due to its violence and that it remained an "ongoing concern."[3] Defendant Dunn explained that the severity of the understaffing—with St. Clair only having 57% of the staff it needed at the time—created a situation in which correctional officers were expected to perform beyond the scope of their training.

92.    In addition, in April 2016, a St. Clair correctional officer discussed the level of danger present at the prison on condition of anonymity.[4] During his interview, the St. Clair officer explained that for any given shift, only three to ten correctional officers actively patrolled the prison. And because all of the other officers were required to stay at their posts, only these three to ten "roving" officers

---

[3]   Lauren Walsh, *ADOC Commissioner: Overcrowding, understaffing breeding violence at St. Clair Prison*, ABC 33/40 (Dec. 10, 2015), https://abc3340.com/news/local/adoc-commissioner-overcrowding-understaffing-breeding-violence-at-st-clair-prison.

[4]   Clare Huddleston, *EXCLUSIVE: St. Clair Correctional Officer talks to WBRC about prison issues*, WBRC FOX6 News (Apr. 7, 2016), https://www.wbrc.com/story/31672139/exclusive-st-clair-correctional-officer-talks-to-wbrc-about-prison-issues/.

could respond to various incidents around the prison, such as the stabbing that occurred here. Later, Defendant Dunn characterized ADOC prisons as the most overcrowded and noted that it would not "be long until we're the most understaffed and most violent."[5] He also recognized in 2019 that there was a "direct correlation between the shortage of officers and violence" in the ADOC prisons. *See* Ex. A at 49.

93.    A New York Times article from March 2017 also detailed the "grim regularity" of attacks at St. Clair, saying that even by the standards of ADOC, "one of the nation's most dysfunctional prison systems," St. Clair stood out for its violence.[6] The reporting revealed "well over half to just about everyone" had access to unpermitted weapons inside the walls of the facility.

94.    Individual inmates subjected to violence at St. Clair have also filed lawsuits, including against the Supervisory Defendants here, putting them on notice again of the pervasive violence at St. Clair. *See McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017) (naming Defendants Dunn, Malone, Estelle, and Mercado); *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017) (naming Defendants Dunn, Malone, Estelle, and Mercado); *Townsel v.*

---

[5]   Campbell Robertson, *An Alabama Prison's Unrelenting Descent Into Violence*, N.Y. TIMES (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.
[6]   Campbell Robertson, *An Alabama Prison's Unrelenting Descent Into Violence*, N.Y. TIMES (Mar. 28, 2017), https://www.nytimes.com/2017/03/28/us/alabama-prison-violence.html.

*Thomas, et al.*, Case 4:17-cv-00516 (N.D. Ala. Mar. 31, 2017) (naming Defendants Dunn, Malone, Estelle, and Mercado); *Russo v. Dunn*, Case No. 2:17-CV-01005-KOB (N.D. Ala. June 15, 2017) (naming Defendants Dunn, Estelle, Graham, and Malone); *Zeller v. Thomas*, Case. No. 4:17-CV-00564-KOB (M.D. Ala. Aug. 22, 2017) (naming Defendants Dunn, Malone, Estelle, and Mercado).

95.    In September 2018, EJI sent a letter (the "EJI Letter") to Defendant Dunn raising concerns about the "concerning increase in serious incidents of violence" at St. Clair and warned about the flow of weapons into St. Clair and the ineffective (at best) search protocols to locate those weapons. The letter specifically pointed out the proliferation of weapons throughout St. Clair and described the deficiencies in the procedures and implementation for rooting out such weapons.

96.    The letter set forth specific actions that the ADOC could take to eliminate contraband, including "completely lock[ing]-down the facility 'for several days' [to] 'conduct a thorough unannounced shake down of all areas'" followed by implementation of regular and routine searches.

97.    In apparent response to the EJI Letter and the class action settlement and in recognition that the current practices were insufficient, in February 2019, on information and belief at Defendant Dunn's direction, Defendant Daniels personally directed facility wardens, including Defendant Jones, to implement "tier rotation" and restrict movements of inmates when they were permitted outside of their cells.

The directive also instructed a warden to be assigned to the "most violent" housing units and to complete a cubicle log to reflect the warden's rounds every two hours. The directive was called the "Controlled Movement Directive," and was part of Defendant Daniels and Dunn's larger project, called "Operation Restore Order."

98.     The "tier rotations" were intended to limit the mingling of inmates by allowing inmates to be free from their cells only during certain, staggered times. The rotations were also intended to "ensure staff were exposed to smaller groups of inmates in emergent situations, thus enhancing their ability to safely engage violent inmates." If followed, given that Moore and Williams were housed in different blocks, such rotations would have prevented Moore's stabbing and likely the stabbing of other of Williams' victims.

99.     Despite this directive from Defendant Daniels, the plan was never put into action. Instead, Defendant Jones took the cursory step of assigning Defendant Pickens to St. Clair to be the warden in charge of implementing the directive, but Defendant Pickens never implemented the rotations or followed the requirement of being present in St. Clair's "hot bay." Neither Defendant Jones, Defendant Daniels, Defendant Dunn, nor any other Supervisory Defendant followed up to ensure that the directive was actually being implemented, thus willfully abdicating their duties.

100.    The wardens, correctional captains, sergeants, lieutenants, and shift commanders (including Defendants Pickens, Brooks, Malone, White, Graham,

Robertson, McLemore, and Robinson) decided that the directive should not be followed in order to "speed up operations." Instead of releasing only one tier of inmates at a time, the correctional staff decided that it was merely faster to release an entire dorm of inmates at one time.

101. The failure to implement the directive, and the Supervisory Defendants' failures to ensure that the directive was followed, directly led to Williams' ability to attack multiple inmates throughout St. Clair's N and O blocks.

102. In addition to the *Duke* class action and various individual lawsuits, an investigation initiated by the federal government similarly prompted Defendants to confront the deplorable conditions of ADOC prisons, including St. Clair. The Department of Justice's Civil Rights Division (the "DOJ") opened an investigation into the level of violence at ADOC prisons in October 2016.

103. In April 2019, a mere month before Moore was stabbed, the DOJ concluded its investigation, finding that there was reasonable cause to believe the "ADOC violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from prisoner-on-prisoner violence, prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions." *See* Ex. A at 55.

104. The DOJ issued a report that is available to the public and was sent directly to each of the correctional facility wardens, including Defendant Jones. On information and belief, each of the Defendants is aware of the DOJ Report and/or its

conclusions and was aware of the report in May 2019. The DOJ Report placed Defendants on notice that, among other things, inmates at St. Clair faced an increased risk of violence due to Defendants' failure to prevent weapons and other contraband from entering the prison, the overcrowding present at the prison, Defendants' lax security protocols, and Defendants' failures to properly classify and house inmates at St. Clair, among other failures. *Id*. at 1.

105.   The DOJ characterized such violations as severe and systemic and exacerbated by serious deficiencies in staffing and supervision, overcrowding, ineffective housing and classification protocols, inability to control the flow of contraband into and within the prison (including illegal drugs and weapons), ineffective prison management and training, and a high level of violence that is frequent, cruel, of an unusual nature, and pervasive. *Id*. at 1-2. The DOJ's experts found that, based on their experience, the amount of prisoner-on-prisoner violence in Alabama's prisons was much higher than in other similar systems. *Id*. at 6. The DOJ further noted that ADOC authorities had known about these issues at least several years prior to the start of the investigation, referencing the pleas made to ADOC in 2014 by plaintiffs' counsel in the *Duke* class action. *Id*. at 48.

106.   As explained in the DOJ Report, any attempts ADOC makes to separate potential predators from victims through classification and housing policies are undermined by deficient supervision, which enables prisoners to roam between

different housing units without staff intervention. *Id.* at 26. As occurred in Moore's case, correctional officers frequently permit prisoners at St. Clair and throughout ADOC to wander from housing unit to housing unit regardless of their assignment or classification. *Id.* In 2017 alone, there were over 1,100 recorded incidents of inmates being in unauthorized locations in ADOC facilities. *Id.* at 26-27. On information and belief, at least a proportional share of those incidents occurred at St. Clair, yet the Supervisory Defendants have not implemented policies or procedures to adequately address the problem, and no Defendant has successfully taken steps to mitigate inmate roaming. Indeed, the DOJ Report expressly put the Defendants on notice that ADOC's failure "to implement effective classification and housing policies…results in violence by commingling prisoners who ought to be kept separate within the same, under-supervised housing units." *Id.* at 26.

107.   The DOJ also determined that dangerous contraband is rampant at St. Clair. The DOJ's review of incident reports revealed that in hundreds of these reports, weapons of some kind were used. Interviews with staff and inmates also made clear that weapons were ubiquitous within ADOC institutions, thus contributing to frequent stabbings and other violent attacks. *Id.* at 2, 13, 14, 17-19, 21; *see supra* ¶ 80.

108.   The DOJ Report observed that officials at St. Clair failed to prevent inmates from obtaining and keeping these weapons. *Id.* at 25-26. These weapons

commonly consist of prison-made knives similar to the one used by Williams, examples of which are pictured below.[7]



---

[7]   Shaila Dewan, *Inside America's Black Box: A Rare Look at the Violence of Incarceration*, THE NEW YORK TIMES (Mar. 30, 2019), https://www.nytimes.com/2019/03/30/us/inside-americas-black-box.html; Ex. A at 26.



*Correctional officer holding a weapon recovered at St. Clair in 2017*

109.   The DOJ expressed that it had reasonable cause to believe that the ADOC was not recording all violent events in incident reports, meaning that it was possible, and perhaps likely, that the violence at St. Clair was greater than what the reported statistics show. *Id*. at 23. But even with this suspected gap in records, the DOJ found that the available incident reports demonstrated a strong pattern of evidence of deficient supervision and a systemic failure across ADOC institutions to provide humane conditions and confinement and take reasonable measures to guarantee inmate safety. *Id*. at 18.

110.   The DOJ concluded that the totality of these conditions poses a substantial risk of serious harm to prisoners (as well as to ADOC's own correctional officers), even when that harm has not yet occurred. *Id*. at 6. The DOJ additionally

found that the State of Alabama is deliberately indifferent to that harm or serious risk of harm and has failed to correct known systemic deficiencies that contribute to this culture of violence. *Id.* at 47-50.

111.  In another more recent report, published in July 2020, the DOJ explained that the severe and pervasive overcrowding in Alabama prisons increases tensions and escalates episodes of violence between prisoners.[8] This report additionally noted that since the issuance of the DOJ Report, the overcrowding within Alabama's prisons had increased even more.

112.  Defendants thus had notice of the ongoing problem with inmate-on-inmate violence at St. Clair for years prior to Williams' attack on Moore.

### E.      Defendants Failed to Adequately Address the Failures That Led to Moore's Attack.

113.  The systemic failures and lack of oversight perpetuated by the Supervisory Defendants, paired with the Correctional Officer Defendants' obvious failures to perform their most rudimentary job duties, directly led to the life-threatening injuries that Moore suffered while in the custody of ADOC.

---

[8]   U.S. DEP'T OF JUSTICE, INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN 2 (July 23, 2020), https://www.justice.gov/crt/case-document/file/1297031/download?utm_medium= email&utm_source= govdelivery.

114.   The failings detailed below, among others, were and continue to be exacerbated by the inadequate investigation and discipline of staff within the ADOC, including promotion of staff with disciplinary problems.

**1. Defendants Failed to Adequately Supervise Prisoners in St. Clair.**

115.   The Defendants, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair to prevent violence. These failures were and are particularly acute in the N and O blocks.

116.   As set forth above, at the time of Moore's stabbing in May 2019, St. Clair, and specifically the N and O blocks, were a hotbed for prisoner-on-prisoner violence. Defendants, through their classification of inmates, created those so-called "hot bays" intentionally.

117.   Despite calling the N and O blocks a "hot bay" with a large proportion of the prisoners housed there having disciplinary problems and histories of violence while in ADOC custody, the Defendants failed to provide adequate security and oversight.

118.   For fiscal year 2017, ADOC reported "critical levels of authorized staffing shortages." *See* Ex. A at 9. In February 2019—just months before the attack on Moore—ADOC acknowledged that it needed to hire over 2,000 correctional officers and 125 supervisors in order to adequately staff its men's prisons but did not do so.

119.    Much of the time, like the night of Moore's stabbing, a single cube officer was the only officer monitoring the entire area of the N and O blocks. These cube officers often failed to pay attention to the happenings in the blocks. Further, cube officers, like Defendant Robinson, often failed to leave their cubicles to ensure that the block was secure, but rather remained enclosed in their cubicle during their shifts. Officers in the cubicle at St. Clair are seen at times asleep or otherwise distracted from their oversight and security obligations. *See id.* at 49. Many of these cube officers had not even completed basic correctional officer training.

120.    Roving officers in the N and O blocks were rarely staffed. No roving officer was staffed on the night Moore was attacked.

121.    Understaffing like this allowed dangerous contraband, including knives and prisoner-made weapons, to proliferate the facility, and allowed prisoners like Williams to roam in unauthorized or unsupervised areas of the prison. Further, the lack of adequate staff resulted in violent attacks occurring without security staff's knowledge. Other times, security staff at St. Clair saw violent or troubling incidents unfold without intervening (like Officer Watts here) based on inadequate training, direction, supervision, or resources.

122.    Inmates were often able to carry out lengthy attacks on other inmates without being discovered by guards, whether because of inadequate staffing or lacking supervision. In other instances, injuries were not discovered until substantial

time had passed following the attack. On other occasions, guards did not intervene in attacks that they personally witnessed.

123.   The on-staff officers often failed to respond to emergency calls from inmates or responded unreasonably slowly. Defendant Robinson failed to respond quickly to Moore's calls for help on the night of his attack, despite having the duty to do so.

124.   On numerous occasions, including some described above, prisoners themselves had to transport injured inmates to the infirmary for care after violent incidents because correctional officers were either unaware or unwilling to help.

125.   The Supervisory Defendants were aware of these security failings but did not take action to protect the inmates reliant on them to do so.

126.   In its letter, EJI warned Defendant Dunn that the creation of the "hot bay" in which Moore was housed was a "dangerous management technique" that directly led to two recent inmate homicides.

127.   The Supervisory Defendants superficially adopted a corrective action plan aimed at curbing some of the violence at St. Clair. Aside from issuing a memorandum directing facilities to implement certain safety and security measures, the Supervisory Defendants took a completely "hands off" approach and did not take reasonable steps to ensure that those polices were started, let alone continued.

128.   Further, in the DOJ Report received by the Supervisory Defendants in April 2019, the DOJ plainly informed the Supervisory Defendants that "[t]he combination of ADOC's overcrowding and understaffing results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons." Ex. A at 5.

129.   Despite being alerted to these security issues, the Supervisory Defendants failed to improve supervision and monitoring in St. Clair, and specifically the N and O blocks. For example, they did not (a) provide any additional staffing; (b) improve supervision and monitoring of existing staff; (c) implement additional training; (d) make an effort to reduce overcrowding; (e) create oversight of correctional officer behaviors; (f) limit the co-mingling of inmates from different housing blocks; or (g) ensure that housing assignments were followed.

130.   These inadequacies led directly to Moore's exposure to an unreasonable risk of violence and his stabbing.

## 2. Defendants Permitted Inmates to Travel between Housing Units and Remain in Unauthorized Areas.

131.   Exacerbated by the understaffing and inadequate supervision, Defendants allowed inmates to freely travel between housing units regardless of their housing assignment.

132.   On information and belief, correctional officers frequently allowed the doors between the housing units to remain open and did not ensure that inmates remained in their assigned areas.

133.   The DOJ investigation revealed that there were over 1,100 incident reports of inmates in unauthorized locations in 2017. On information and belief, that number was at least as high in 2018 and 2019. Further, the EJI Letter informed Defendants that "uncontrolled movement contribut[ed] to an increased risk of harm at [St. Clair]."

134.   In recognition of the contribution of inmate co-mingling to the violence in St. Clair, Defendant Daniels and other Supervisory Defendants issued a memorandum directing St. Clair to implement "tier rotations" so that a very limited number of inmates were allowed to roam within their housing block at one time. The plan was never implemented, and entire housing blocks were allowed to be "free" at one time, resulting in an unmanageable situation for the correctional officers if violence broke out.

135.   The Supervisory Defendants made no effort to ensure the safety enhancements they recommended were followed.

136.   Many attacks at St. Clair involved an inmate being in an unauthorized location.

137.   For example, in June 2014, an inmate was assaulted in the hallway between P and Q blocks by a prisoner who, on information and belief, was not assigned to either block. There were no officers present. He was strangled and then dragged while unconscious into the showers in Q block. He remained in the showers from approximately 7:30 a.m. until 1:00 p.m. and was never found by staff.

138.   In December 2014, an inmate was stabbed at least eight times in the head and neck in the dayroom by a prisoner with a history of violence who was not assigned to that block.

139.   In January 2015, an inmate was robbed and stabbed in his cell in N block by an inmate who was assigned elsewhere. The inmate required extensive surgery at an outside hospital.

140.   In February 2015, an inmate was stabbed during an attempted robbery in his cell in L block by an inmate assigned to a different block. He suffered a collapsed lung, which required extensive treatment, including surgery, at the hospital.

141.   In May 2015, an inmate was robbed and assaulted by assailants who were allowed to enter the block even though they were assigned to a different block.

142.   All of these incidents and others–including Moore's–would not have happened had the Defendants ensured that inmates remained in their assigned

locations and had enforced policies in place to prevent such haphazard inmate movement.

143.   Just three months before Moore's attack, Defendant Daniels met with Defendant Jones to discuss a plan for implementing the "Controlled Movement Directive" during "Operation Restore Order" at St. Clair. Several days later, Defendant Daniels sent Defendant Jones two memoranda addressing transfer of certain inmates in the St. Clair "hot bays," assigning additional staff, and setting out procedures for rounds logbooks.

144.   Defendant Pickens was transferred to St. Clair and assigned to the P and Q blocks (later the N and O blocks) under those memoranda and was "mandated to enforce [] procedures" to "ensure inmates assigned to [the] P & Q cellblocks would only be out of their cells at a designated time."

145.   On May 8, 2019–less than a month before Moore's attack-- Defendant Pickens signed a memorandum from Defendant Jones confirming that he was responsible for "ensuring staff and inmates complied with tier lockdown procedures" and "log[ging] his tour of the cellblocks every two hours."

146.   Despite these responsibilities, neither Defendant Pickens nor any other Defendant implemented the "Controlled Movement Directive," and instead permitted inmates in the P and Q cellblocks to be out of lockdown at unpermitted times, often times allowing full housing dorms to be "free" at once.

147.   These failures led directly to Williams' ability to travel freely from the O housing block to Moore's cell in the N housing block, resulting in Moore's stabbing (among others).

### 3.  Defendants Did Not Take Reasonable Steps to Limit the Flow of Weapons at St. Clair.

148.   Instead of taking reasonable steps to prevent the proliferation of weapons in St. Clair, Defendants fostered and enabled the accumulation of weapons through at least two practices: (a) inadequate search procedures; and (b) inappropriate responses when weapons were recovered. These practices resulted in widespread possession of weapons by inmates, and frequent and repeated use of those weapons in attacks like Moore's.

149.   Security staff at St. Clair Prison, including the Correctional Officer Defendants, did not regularly conduct prison-wide searches and other standard prison-search protocols and procedures to root out contraband, despite their awareness of weapons in the facility. The Supervisory Defendants turned a blind eye to noncompliance with search protocols.

150.   In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person cellblock at St. Clair could contain "30 to 40" knives; contraband was

"out of control"; and prisoners were being "being assaulted in every way imaginable."[9]

151.   Inmates at St. Clair were often found with contraband but were often not punished for possessing it. Other times, procedures were not followed to search for contraband and it was never found (like Williams' weapons here).

152.   When officers did recover weapons from inmates, they often responded with indifference, frequently declining to discipline inmates found with knives or other contraband weapons.

153.   All Defendants were well aware of the amount of weapons in inmates' hands at St. Clair. For example, the EJI Letter to Defendant Dunn informed Defendants that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair" and encouraged ADOC leadership, including the Supervisory Defendants here, to take corrective action to mitigate the weapons in the prison.

154.   Further, the DOJ Report detailed how inmate access to dangerous weapons contributes to the unconstitutional safety risks at St. Clair and other ADOC facilities. The DOJ Report indicated that officials needed to take steps to enhance

---

[9]   Cam Ward, *Alabama Correctional Officer Numbers Down 20%, Montgomery Advertiser* (Jan. 8, 2017), http://www.camward.com/alabama_correctional_officer_ numbers_down_20.

correctional officer screening, adequately monitor prisoners, and confiscate weapons.

155.   The Defendants did not take steps to reduce inmate access to weapons. For example, they did not implement screening on entry for officers to limit entry of outside, manufactured weapons, complete full-facility searches for weapons, or even search and confiscate weapons from inmates they had reason to believe might be armed and dangerous, like Williams.

156.   Further, even in the instances where weapons were recovered, the Supervisory Defendants failed to ensure that inmates were properly disciplined for possession of weapons, thus creating a dangerous culture whereby inmates knew they could possess weapons with impunity and felt emboldened to use those weapons without fear of incurring discipline.

157.   The Supervisory Defendants took no meaningful action to curb the availability of weapons at St. Clair or prevent prisoners from roaming in unauthorized or unsupervised areas of the facility, thus endangering inmates and making them potential victims of serious harm. The Correctional Officer Defendants likewise failed to take reasonable (or any) steps to ensure that Williams did not have weapons when he was improperly locked in Moore's cell.

158.   These failures led directly to the unreasonably heightened risk of inmate violence Moore faced and directly to Williams' attack of Moore with an ice pick and a prison shank.

### 4. Defendants Failed to Conduct Reasonable Investigations into Inmate Violence.

159.   The Defendants failed to sufficiently investigate instances of violence at St. Clair, and instead conducted cursory investigations with reports lacking detail and insufficient discipline.

160.   As detailed above, there were hundreds of reported incidents of inmate violence at St. Clair. On information and belief, a small fraction of those violent perpetrators was properly disciplined, in part because of Defendants' failure to fully investigate and determine the assailants' identities.

161.   Defendants' failures directly led to (a) repeated violent attacks by the same perpetrators and (b) a widespread belief that acts of violence would not be investigated or reprimanded.

162.   Defendants purposefully misrepresented incidents and underreported statistics to make the conditions at St. Clair and throughout the ADOC seem less gruesome than they are. For example, as detailed in the DOJ Report, the ADOC improperly reported (or failed to report at all) at least *thirty* deaths over three years. Ex. A at 15-16. For example, the DOJ discovered that a prisoner was murdered by other prisoners in May 2017, but the inmate's death was not reported. In February

2017, a prisoner was stabbed to death by another prisoner with a homemade knife, but the ADOC failed to report even his death. That same month, a prisoner died after being attacked by two others and the ADOC reported his death as "natural."

163.   Despite knowledge of these failures, the Supervisory Defendants failed to require adequate investigations and punishment for violence at St. Clair and failed to provide sufficient oversight of the officers in charge of conducting such investigations.

164.   The Correctional Officer Defendants failed to conduct a sufficient investigation into the stabbings that occurred prior to Moore's. An adequate investigation and proper punishment for the assailant likely would have prevented Moore's attack.

165.   The Defendants' failings led directly to Williams having the opportunity to violently assault Moore.

### 5. Defendants Failed to Properly Classify and House Inmates, Resulting in "Hot Bays" with Increased Inmate Risk of Violence.

166.   As detailed in the DOJ Report, St. Clair had ineffective and unsafe housing assignment practices, leading to violence between inmates who should have been kept separate from one another. *See* Ex. A at 26. Defendants Graham and Estelle, among others, were responsible for classifying inmates and housing assignments. The other Supervisory Defendants were aware of the practice of creating "hot bays" within ADOC and at St. Clair specifically, and did not make any

attempt to rectify the management failure and increased safety risks it posed to inmates.

167.   On information and belief, the Defendants intentionally concentrated inmates with disciplinary problems in its "hot bays," but did not staff either block with additional officers, implement any additional safety procedures, or even follow the existing security procedures.

168.   The Defendants were aware that the N and O housing blocks were "hot bays," but did not take steps to reasonably assure Moore's safety in the high-risk housing block.

169.   Between September and Moore's attack, there were at least thirteen violent incidents that occurred in the N and O blocks (formerly the P and Q blocks), one of which involved Williams.

170.   As a result of Defendants' creation of a "hot bay" in the N and O blocks and Moore's assignment there, particularly in the absence of additional security measures, Defendants placed Moore at an unreasonably high risk of violence and led directly to Moore's attack.

**F.     Moore Remains at an Unreasonably Heightened Risk of Violence at St. Clair.**

171.   Even after Williams' rampage, Defendants did not take any reasonable steps to make St. Clair safe for its inhabitants. Indeed, after concluding that the ADOC had failed to take steps to correct the issues identified by the DOJ Report, on

December 9, 2020, the DOJ filed suit against ADOC. The lawsuit alleges, among other things, that ADOC is "deliberately indifferent to the serious risk of substantial harm in Alabama's prisons for men" and "fail[s] to protect prisoners. . . from serious harm and a substantial risk of serious harm at the hands of other prisoners." Ex. D ¶¶ 37, 98. The complaint reiterates many of the harrowing details to which the DOJ alerted the ADOC in April 2019, noting that the ADOC has failed to address most, if not all, of the issues leading to unconstitutional conditions for inmates.

172.   Notably, again, the DOJ concluded that ADOC continues to fail to adequately protect its prisoners from serious risks of harm. According to the complaint, in 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system. *Id*. ¶ 40. This is true despite the fact that the ADOC fails to adequately account for the cause of prisoners' deaths, instead accounting for deaths caused by prisoner-on-prisoner violence as "natural deaths." *Id.* ¶ 52.

173.   The DOJ further alleges that "from September 2018 to September 2019, at least 280 Alabama prisoners suffered serious injuries, defined as requiring transport to outside hospitals, as the result of assaults." *Id*. ¶ 43. Moore and Williams' other victims are part of these statistics.

174.   Since the DOJ initiated its investigation in 2016, ADOC's prisons, including St. Clair, have become even more overcrowded and remain critically and dangerously understaffed, which contributes directly to the epidemic of violence

within the prisons. *Id*. ¶¶ 100-01. Despite having 3,326 authorized correctional officer positions, ADOC employs less than a third of those positions. *Id.* ¶¶ 50-51. And the DOJ concludes that such understaffing is directly correlated to the violence and death of inmates within the ADOC. *Id.* ¶¶ 48-49.

175.   The DOJ again made clear that the ADOC staff "fail to prevent uncontrolled movement of prisoners, leading to prisoners roaming in unauthorized or unsupervised areas and leading to violence." *Id*. ¶ 63. Further, the DOJ noted "lax supervision" by security staff which led them to "often fail to observe violent incidents and only discover the victim after the violence and/or injuries occur." *Id*. ¶ 54.

## EXHAUSTION OF LEGAL REMEDIES

176.   There is no grievance procedure available to Moore at St. Clair or through the ADOC for the violations Moore pleads herein.

## CLAIMS

### Count I
### Violation of the Eighth Amendment (Failure to Protect)
(42 U.S.C. § 1983)
(Against All Defendants)

177.   Pursuant to the Eighth Amendment of the United States Constitution, Moore is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

178.   Defendants, acting individually and in conspiracy with each other, failed to protect Moore.

179.   Moore faced a substantial risk of serious attack from another inmate while housed at St. Clair. This substantial risk arose from both (a) the longstanding, pervasive, and well-documented history of serious inmate-on-inmate violence at St. Clair, particularly in the N and O blocks where Moore was housed and (b) the specific threat posed by Williams after Williams was allowed to remain in Moore's cell despite not being searched for weapons after several violent attacks the same day of Moore's attack. The general substantial risk of serious inmate-on-inmate violence is described more fully at paragraphs 71-82 (incorporated here by reference). The specific threat posed by Williams is described more fully at paragraphs 36-70 (incorporated here by reference).

180.   As described in more detail in paragraphs 83-112 above (incorporated here by reference), Defendants knew of the substantial risk that Moore would be seriously injured while in custody at St. Clair. Given the obviousness of the risk based on the staggering rate of brutal attacks at St. Clair (described at paragraphs 71-82 ,which are incorporated here by reference), all Defendants are charged with notice of the substantial risk to Moore. *See Farmer v. Brennan*, 511 U.S. 823, 842 (1994). Moreover, each Defendant was aware of the substantial risk facing Moore in the following ways:

(a)     Defendant Dunn, as Commissioner of the ADOC, was aware of the monthly reports released by the ADOC reflecting the crippling level of inmate-on-inmate violence at St. Clair. Further, Defendant Dunn received the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) which described in detail the ubiquitous threats of substantial harm to inmates at St. Clair, and specifically in the N and O blocks. Defendant Dunn was also on notice of the substantial risk to Moore based on the litigation in which he was involved, including a settlement to which he was a party in the *Duke v. Dunn* case (described more fully at paragraphs 84-90, 94 and incorporated here by reference). Defendant Dunn further has made statements regarding the violence at St. Clair and throughout the ADOC (described more fully at paragraphs 91 and 92 and incorporated here by reference). Finally, Dunn instructed his subordinates to implement Operation Restore Order in response to the above notice, reflecting Defendant Dunn's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(b)     Defendant Daniels, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew

of the substantial understaffing issues and resulting lack of control therefrom.

Further, on information and belief, Defendant Daniels knew of and discussed the EJI Letter and DOJ Report with Defendant Dunn and other ADOC officials (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference). Defendant Daniels was also personally involved in Defendant Dunn's failed Operation Restore Order mission, which was in response to the EJI letter, reflecting Defendant Daniels's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(c)     Defendant Brand, through his responsibilities of training and developing the ADOC workforce, knew that the correctional officers charged with Moore's safety were insufficiently trained to address the inmate-on-inmate violence. Further, on information and belief, Defendant Brand knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(d)     Defendant Ellington, as Institutional Coordinator for the Northern Region of the ADOC, knew of the substantial inmate-on-inmate violence at St. Clair through (1) his oversight of the prison, including personal visits; (2) his communications with Warden Jones and other St. Clair staff; and (3) his

59

position as liaison between ADOC executive leadership and St. Clair. Further, on information and belief, Defendant Ellington knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(e)     Defendant Mercado, as Chief Law Enforcement Officer, knew of the substantial inmate-on-inmate violence at St. Clair based on his investigations of the violent attacks there. Further, on information and belief, Defendant Mercado knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(f)     Defendant Jones, as Warden of St. Clair, personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff. Further, Defendant Jones was directed by Defendant Daniels to implement tier rotation, as part of Defendant Dunn's Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), which reflects her knowledge that there was a security and violence problem at St. Clair. Further, Defendant Jones personally received the DOJ Report

(described more fully at paragraphs 11, 103-110 and incorporated here by reference). On information and belief, Defendant Jones was aware of the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and discussed it with Defendant Daniels, among others.

(g)     Defendant Pickens personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Defendant Pickens was also aware of the high rate of contraband weapons circulating though St. Clair based on his personal involvement in contraband searches. Further, on information and belief, Defendant Pickens was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant Pickens was aware of the substantial risk posed by the pervasive violence at St. Clair based on his discussions with Warden Jones, including regarding Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), for which he was assigned to St. Clair.

(h)     Defendant Estelle personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and

communications with his subordinates. Further, on information and belief, Defendant Estelle was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Estelle was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Estelle's housing classifications played a substantial role in creating those "hot bays."

(i)     Defendant Brooks personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Brooks was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Brooks was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(j)     Defendant Malone personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent

or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Malone was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Malone was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Defendant Malone was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Brooks authorized dangerous inmates to be concentrated in the "hot bays."

(k)     Defendant Graham personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with her subordinates. Further, on information and belief, Defendant Graham was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through her discussions with Warden Jones, among others. Defendant Graham was aware of the substantial risk posed by the pervasive violence at St. Clair based on her involvement in failing to implement Operation Restore Order (described

more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(l)     Defendant White personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant White was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(m)     Defendant Robertson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant

Robertson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his suspicion of Williams' involvement in stabbings that Defendant Robertson knew occurred earlier the same day Moore was attacked; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; (3) his knowledge that Williams had not been searched for weapons; and (4) his knowledge that Williams was not assigned to Moore's cell.

(n)     Defendant McLemore personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Further, Defendant McLemore was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

(o)     Defendant Robinson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant Robinson was aware of the substantial risk posed

by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robinson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

181.   Defendants consciously disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify

inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference); and (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference).  Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

(a)    Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)    Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4)

improper housing and classification procedures, (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

(c)    Defendants Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (1) allowed Williams to freely travel between N and O blocks; (2) failed to search Williams for weapons; (3) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (4) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (5) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (6) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

182.    The pattern and practice of misconduct at St. Clair occurred with the consent and direction of the Supervisory Defendants, who personally knew about,

facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by the actions and inactions described in the preceding paragraph.

183.   Defendants' actions and inactions set forth above were deliberately indifferent, malicious, willful, beyond their authority, and/or recklessly indifferent to the substantial risk they knew Moore faced, and were objectively unreasonable.

184.   These Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## **Count II**
## **Violation of the Eighth and Fourteenth Amendment (State-Created Danger)**
(42 U.S.C. § 1983)
(Against All Defendants)

185.   Pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, Moore is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State, including from a State-created danger.

186.   Defendants limited Moore's ability to care for himself in prison.

187.   As described in more detail in paragraphs 83-112 above (incorporated here by reference), Defendants knew of the substantial risk that Moore would be seriously injured while in custody at St. Clair. Given the obviousness of the risk based on the staggering rate of brutal attacks at St. Clair (described at paragraphs 71-82 ,which are incorporated here by reference), all Defendants are charged with notice of the substantial risk to Moore. *See Farmer v. Brennan*, 511 U.S. 823, 842 (1994). Moreover, each Defendant was aware of the substantial risk facing Moore in the following ways:

(a)    Defendant Dunn, as Commissioner of the ADOC, was aware of the monthly reports released by the ADOC reflecting the crippling level of inmate-on-inmate violence at St. Clair. Further, Defendant Dunn received the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) which described in detail the ubiquitous threats of substantial harm to inmates at St. Clair, and specifically in the N and O blocks. Defendant Dunn was also on notice of the substantial risk to Moore based on the litigation in which he was involved, including a settlement to which he was a party in the *Duke v. Dunn* case (described more fully at paragraphs 84-90, 94 and incorporated here by reference). Defendant Dunn further has made statements regarding the violence at St. Clair and

throughout the ADOC (described more fully at paragraphs 91 and 92 and incorporated here by reference). Finally, Dunn instructed his subordinates to implement Operation Restore Order in response to the above notice, reflecting Defendant Dunn's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(b)     Defendant Daniels, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew of the substantial understaffing issues and resulting lack of control therefrom. Further, on information and belief, Defendant Daniels knew of and discussed the EJI Letter and DOJ Report with Defendant Dunn and other ADOC officials (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference). Defendant Daniels was also personally involved in Defendant Dunn's failed Operation Restore Order mission, which was in response to the EJI letter, reflecting Defendant Daniels's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(c)     Defendant Brand, through his responsibilities of training and developing the ADOC workforce, knew that the correctional officers charged with Moore's safety were insufficiently trained to address the inmate-on-

inmate violence. Further, on information and belief, Defendant Brand knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(d)     Defendant Ellington, as Institutional Coordinator for the Northern Region of the ADOC, knew of the substantial inmate-on-inmate violence at St. Clair through (1) his oversight of the prison, including personal visits; (2) his communications with Warden Jones and other St. Clair staff; and (3) being the liaison between ADOC executive leadership and St. Clair. Further, on information and belief, Defendant Ellington knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(e)     Defendant Mercado, as Chief Law Enforcement Officer, knew of the substantial inmate-on-inmate violence at St. Clair based on his investigations of the violent attacks there. Further, on information and belief, Defendant Mercado knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(f)     Defendant Jones, as Warden of St. Clair, personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff. Further, Defendant Jones was directed by Defendant Daniels to implement tier rotation, as part of Defendant Dunn's Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), which reflects her knowledge that there was a security and violence problem at St. Clair. Further, Defendant Jones personally received the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference). On information and belief, Defendant Jones was aware of the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and discussed it with Defendant Daniels, among others.

(g)     Defendant Pickens personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Defendant Pickens was also aware of the high rate of contraband weapons circulating though St. Clair based on his personal involvement in contraband searches. Further, on information and belief, Defendant Pickens was aware of the DOJ Report (described more fully

at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant Pickens was aware of the substantial risk posed by the pervasive violence at St. Clair based on his discussions with Warden Jones, including regarding Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), for which he was assigned to St. Clair.

(h)     Defendant Estelle personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Estelle was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Estelle was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Estelle's housing classifications played a substantial role in creating those "hot bays."

(i)     Defendant Brooks personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief,

Defendant Brooks was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Brooks was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(j)    Defendant Malone personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Malone was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Malone was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Defendant Malone was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Brooks authorized dangerous inmates to be concentrated in the "hot bays."

(k)     Defendant Graham personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her subordinates. Further, on information and belief, Defendant Graham was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through her discussions with Warden Jones, among others. Defendant Graham was aware of the substantial risk posed by the pervasive violence at St. Clair based on her involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(l)     Defendant White personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant White was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described

more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(m)     Defendant Robertson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robertson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his suspicion of Williams' involvement in stabbings that Defendant Robertson knew occurred earlier the same day Moore was attacked; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; (3) his knowledge that Williams had not been searched for weapons; and (4) his knowledge that Williams was not assigned to Moore's cell.

(n)     Defendant McLemore personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Further, Defendant McLemore was aware of the substantial

risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

(o)    Defendant Robinson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant Robinson was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robinson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

188.    Defendants consciously disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at

paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference); (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference).   Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

    (a)    Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the

prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)    Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

(c)    Defendant Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (1) allowed Williams to freely travel between N and O blocks; (2) failed to search Williams for weapons; (3) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (4) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell

or cell block; (5) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (6) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

189.   The pattern and practice of misconduct at St. Clair occurred with the consent and direction of the Supervisory Defendants, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly disregarded the substantial risk of serious harm posed by the actions and inactions described in the preceding paragraph.

190.   Defendants' failures described above placed Moore at an increased danger of violence by another inmate that he would not have otherwise faced had they taken the actions above.

191.   The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and reckless indifference to the rights of Moore and other prisoners and was objectively unreasonable.

192.   These Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab

wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## Count III
## Violation of the Eighth and Fourteenth Amendment (Failure to Intervene)
(42 U.S.C. § 1983)
(Against the Correctional Officer Defendants)

193.   On information and belief, Defendant Robertson suspected that Williams had been involved in multiple stabbings that had occurred in the hours leading up to Moore's attack. The Correctional Officer Defendants all knew that there had been multiple stabbings in the N and O blocks on May 25, 2019 and that no inmate had been segregated based on the assaults.

194.   As a result of their knowledge, the Correctional Officer Defendants placed the N cellblock into "lockdown." The Correctional Officer Defendants knew that a lockdown required all inmates to return to their assigned cells and remain there.

195.   The Correctional Officer Defendants (separately and together) conducted multiple bed checks and roster counts and determined that Williams was not assigned to Moore's cell. Despite this, the Correctional Officer Defendants did not remove Williams from Moore's cell or return him to the correct cell and cellblock. Knowing that Moore faced a specific threat from an inmate who had

committed stabbings earlier in the day, none of the Correctional Officer Defendants searched Williams for weapons at any time he was in Moore's cell.

196.   A substantial risk of serious harm existed, and the Correctional Officer Defendants knew about it when they locked Williams in Moore's cell with him without searching him for weapons.

197.   The Correctional Officer Defendants had the realistic opportunity to intervene to protect Moore from further serious harm by (a) removing Williams from Moore's cell and returning him to his assigned cell and/or (b) searching Williams for weapons. No Correctional Officer Defendant took these reasonable steps to prevent serious harm to Moore.

198.   After Williams began stabbing Moore (as described in more detail in paragraphs 36-49, incorporated here by reference), the Correctional Officer Defendants became aware of the attack through (a) Moore's calls for help by pressing the emergency call button in his cell; (b) Moore's verbal cries for help; and/or (c) the other inmates' verbal calls for help and sounds from the other inmates hitting the cell bars. A substantial risk of serious harm existed once the assault on Moore began.

199.   After any of these notifications, the Correctional Officer Defendants had the realistic opportunity to intervene to protect Moore from further serious harm.

No Correctional Officer Defendant took reasonable steps to prevent further serious harm to Moore.

200.   Defendants' failures were objectively unreasonable, were undertaken intentionally and with willful indifference to Moore's constitutional rights, and/or beyond their authority.

201.   These Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## Count IV
## Conspiracy to Violate the Eighth and Fourteenth Amendments
(42 U.S.C. § 1983)
(Against All Defendants)

202.   Defendants and other co-conspirators not yet known to Moore acted in concert with one another to accomplish an unlawful purpose by unlawful means.

203.   The Supervisory Defendants reached an agreement amongst themselves to deprive Moore of his right to be free from unreasonable harm and failed to intervene to prevent harm from occurring to Moore, in violation of Moore's constitutional rights, by agreeing to not adopt safer policies and procedures in response to the epidemic of violence at St. Clair, by agreeing to understaff and overpopulate St. Clair, by agreeing to house perceived danger-prone inmates

together, by agreeing to not implement or supervise Operation Restore Order, and by agreeing to overlook correctional officers' safety and security failings.

204. In furtherance of this conspiracy, the Supervisory Defendants committed overt acts and were otherwise willful participants in joint activity. Specifically, the Supervisory Defendants consciously disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference);

and (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference). Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

(a)     Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)     Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented

(or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

205.   The Correctional Officer Defendants reached an agreement amongst themselves to deprive Moore of his right to be free from unreasonable harm and failed to intervene to prevent harm from occurring to Moore, in violation of Moore's constitutional rights.

206.   In furtherance of this conspiracy, the Correctional Officer Defendants committed overt acts and were otherwise willful participants in joint activity. Specifically, Defendants Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (a) allowed Williams to freely travel between N and O blocks; (b) failed to search Williams for weapons; (c) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (d) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (e) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (f) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

207.   Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## Count V
## Negligence
(Against All Defendants)

208.   By virtue of his being in the custody of the ADOC at St. Clair, Defendants had a duty to protect Moore from unreasonable danger.

209.   As described in more detail in paragraphs 83-112 above (incorporated here by reference), Defendants knew or should have known that their failures put Moore at an unreasonably heightened risk of inmate violence given the obviousness of the risk based on the staggering rate of brutal attacks at St. Clair (described at paragraphs 71-82 , which are incorporated here by reference). Moreover, each Defendant was or should have been aware of the substantial risk facing Moore in the following ways:

(a)    Defendant Dunn, as Commissioner of the ADOC, was aware of the monthly reports released by the ADOC reflecting the crippling level of inmate-on-inmate violence at St. Clair. Further, Defendant Dunn received the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and the DOJ Report (described more fully at paragraphs 11, 103-

110 and incorporated here by reference) which described in detail the ubiquitous threats of substantial harm to inmates at St. Clair, and specifically in the N and O blocks. Defendant Dunn was also on notice of the substantial risk to Moore based on the litigation in which he was involved, including a settlement to which he was a party in the *Duke v. Dunn* case (described more fully at paragraphs 84-90, 94 and incorporated here by reference). Defendant Dunn further has made statements regarding the violence at St. Clair and throughout the ADOC (described more fully at paragraphs 91 and 92 and incorporated here by reference). Finally, Dunn instructed his subordinates to implement Operation Restore Order in response to the above notice, reflecting Defendant Dunn's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(b)     Defendant Daniels, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew of the substantial understaffing issues and resulting lack of control therefrom. Further, on information and belief, Defendant Daniels knew of and discussed the EJI Letter and DOJ Report with Defendant Dunn and other ADOC officials (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference). Defendant Daniels was also personally

involved in Defendant Dunn's failed Operation Restore Order mission, which was in response to the EJI letter, reflecting Defendant Daniels's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(c)     Defendant Brand, through his responsibilities of training and developing the ADOC workforce, knew that the correctional officers charged with Moore's safety were insufficiently trained to address the inmate-on-inmate violence. Further, on information and belief, Defendant Brand knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(d)     Defendant Ellington, as Institutional Coordinator for the Northern Region of the ADOC, knew of the substantial inmate-on-inmate violence at St. Clair through (1) his oversight of the prison, including personal visits; (2) his communications with Warden Jones and other St. Clair staff; and (3) being the liaison between ADOC executive leadership and St. Clair. Further, on information and belief, Defendant Ellington knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(e)     Defendant Mercado, as Chief Law Enforcement Officer, knew of the substantial inmate-on-inmate violence at St. Clair based on his investigations of the violent attacks there. Further, on information and belief, Defendant Mercado knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(f)     Defendant Jones, as Warden of St. Clair, personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff. Further, Defendant Jones was directed by Defendant Daniels to implement tier rotation, as part of Defendant Dunn's Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), which reflects her knowledge that there was a security and violence problem at St. Clair. Further, Defendant Jones personally received the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference). On information and belief, Defendant Jones was aware of the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and discussed it with Defendant Daniels, among others.

(g)     Defendant Pickens personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Defendant Pickens was also aware of the high rate of contraband weapons circulating though St. Clair based on his personal involvement in contraband searches. Further, on information and belief, Defendant Pickens was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant Pickens was aware of the substantial risk posed by the pervasive violence at St. Clair based on his discussions with Warden Jones, including regarding Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), for which he was assigned to St. Clair.

(h)     Defendant Estelle personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Estelle was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant

Estelle was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Estelle's housing classifications played a substantial role in creating those "hot bays."

(i)      Defendant Brooks personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Brooks was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Brooks was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(j)      Defendant Malone personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Malone was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his

discussions with Defendants Jones and Pickens, among others. Defendant Malone was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Defendant Malone was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Brooks authorized dangerous inmates to be concentrated in the "hot bays."

(k)     Defendant Graham personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her subordinates. Further, on information and belief, Defendant Graham was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through her discussions with Warden Jones, among others. Defendant Graham was aware of the substantial risk posed by the pervasive violence at St. Clair based on her involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(l)     Defendant White personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent

or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant White was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(m)     Defendant Robertson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robertson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his suspicion of Williams' involvement in stabbings that Defendant Robertson knew occurred earlier the same day Moore was attacked; (2) his knowledge that there had been multiple stabbings

in the N and O blocks earlier that day; (3) his knowledge that Williams had not been searched for weapons; and (4) his knowledge that Williams was not assigned to Moore's cell.

(n)     Defendant McLemore personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Further, Defendant McLemore was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

(o)     Defendant Robinson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant Robinson was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robinson was aware of the substantial risk of harm posed by Williams to

Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

210.   Defendants failed to act and therefore breached their duty to protect Moore from unreasonable danger by disregarding the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described

more fully at paragraphs 131-147 and incorporated here by reference); and (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference). Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

(a)     Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)     Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented

(or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

(c)     Defendant Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (1) allowed Williams to freely travel between N and O blocks; (2) failed to search Williams for weapons; (3) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (4) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (5) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (6) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

211.   The above actions demonstrate that the Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

212.   Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab

wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

**Count VI**

**Outrage**

(Against All Defendants)

213.   As described in more detail in paragraphs 83-112 above (incorporated here by reference), Defendants knew of the substantial risk that Moore would be seriously injured while in custody at St. Clair. Given the obviousness of the risk based on the staggering rate of brutal attacks at St. Clair (described at paragraphs 71-82 ,which are incorporated here by reference), all Defendants are charged with notice of the substantial risk to Moore. *See Farmer v. Brennan*, 511 U.S. 823, 842 (1994). Moreover, each Defendant was aware of the substantial risk facing Moore in the following ways:

(a)     Defendant Dunn, as Commissioner of the ADOC, was aware of the monthly reports released by the ADOC reflecting the crippling level of inmate-on-inmate violence at St. Clair. Further, Defendant Dunn received the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) which described in detail the ubiquitous threats of substantial harm to inmates at St. Clair, and specifically in the N and O blocks. Defendant Dunn was also on notice of the substantial

100

risk to Moore based on the litigation in which he was involved, including a settlement to which he was a party in the *Duke v. Dunn* case (described more fully at paragraphs 84-90, 94 and incorporated here by reference). Defendant Dunn further has made statements regarding the violence at St. Clair and throughout the ADOC (described more fully at paragraphs 91 and 92 and incorporated here by reference). Finally, Dunn instructed his subordinates to implement Operation Restore Order in response to the above notice, reflecting Defendant Dunn's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(b)    Defendant Daniels, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew of the substantial understaffing issues and resulting lack of control therefrom. Further, on information and belief, Defendant Daniels knew of and discussed the EJI Letter and DOJ Report with Defendant Dunn and other ADOC officials (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference). Defendant Daniels was also personally involved in Defendant Dunn's failed Operation Restore Order mission, which was in response to the EJI letter, reflecting Defendant Daniels's knowledge of

the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(c)     Defendant Brand, through his responsibilities of training and developing the ADOC workforce, knew that the correctional officers charged with Moore's safety were insufficiently trained to address the inmate-on-inmate violence. Further, on information and belief, Defendant Brand knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(d)     Defendant Ellington, as Institutional Coordinator for the Northern Region of the ADOC, knew of the substantial inmate-on-inmate violence at St. Clair through (a) his oversight of the prison, including personal visits; (b) his communications with Warden Jones and other St. Clair staff; and (c) being the liaison between ADOC executive leadership and St. Clair. Further, on information and belief, Defendant Ellington knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(e)     Defendant Mercado, as Chief Law Enforcement Officer, knew of the substantial inmate-on-inmate violence at St. Clair based on his investigations

of the violent attacks there. Further, on information and belief, Defendant Mercado knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(f)     Defendant Jones, as Warden of St. Clair, personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff. Further, Defendant Jones was directed by Defendant Daniels to implement tier rotation, as part of Defendant Dunn's Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), which reflects her knowledge that there was a security and violence problem at St. Clair. Further, Defendant Jones personally received the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference). On information and belief, Defendant Jones was aware of the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and discussed it with Defendant Daniels, among others.

(g)     Defendant Pickens personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and

communications with his subordinates. Defendant Pickens was also aware of the high rate of contraband weapons circulating though St. Clair based on his personal involvement in contraband searches. Further, on information and belief, Defendant Pickens was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant Pickens was aware of the substantial risk posed by the pervasive violence at St. Clair based on his discussions with Warden Jones, including regarding Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), for which he was assigned to St. Clair.

(h)     Defendant Estelle personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Estelle was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Estelle was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Estelle's housing classifications played a substantial role in creating those "hot bays."

(i)     Defendant Brooks personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Brooks was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Brooks was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(j)     Defendant Malone personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Malone was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Malone was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore

Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Defendant Malone was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Brooks authorized dangerous inmates to be concentrated in the "hot bays."

(k)     Defendant Graham personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her subordinates. Further, on information and belief, Defendant Graham was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through her discussions with Warden Jones, among others. Defendant Graham was aware of the substantial risk posed by the pervasive violence at St. Clair based on her involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(l)     Defendant White personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant White was aware of the DOJ Report (described more fully at

paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(m)    Defendant Robertson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robertson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his suspicion of Williams' involvement in stabbings that Defendant Robertson knew occurred earlier the same day Moore was attacked; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; (3) his knowledge that Williams had not been searched for weapons; and (4) his knowledge that Williams was not assigned to Moore's cell.

(n)    Defendant McLemore personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Further, Defendant McLemore was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

(o)    Defendant Robinson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant Robinson was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robinson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple

stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

214. Despite their knowledge, Defendants intentionally and recklessly disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by Defendants consciously disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference); and (h) failing

to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference).  Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

(a)    Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)    Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented

(or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

(c)     Defendant   Robertson,   McLemore,   and   Robinson   consciously disregarded the substantial risk to Moore when they (1) allowed Williams to freely travel between N and O blocks; (2) failed to search Williams for weapons; (3) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (4) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (5) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there;  and (6) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

215.   Defendants' above failures were extreme and outrageous and were undertaken with malice, willfulness, and reckless indifference to Moore's rights.

216.   These Defendants' misconduct directly and proximately caused the serious emotional distress (including PTSD, fear, anxiety, rage, and other intense emotional suffering) Moore suffered and continues to suffer from Williams' attack.

**Count VII**

**Civil Conspiracy under Alabama law**

(Against All Defendants)

217.  Defendants and other co-conspirators not yet known to Moore acted in concert with one another to accomplish an unlawful purpose by unlawful means.

218.  The Supervisory Defendants reached an agreement amongst themselves to act in concert to deprive Moore of his right to be free from unreasonable harm and failed to intervene to prevent harm from occurring to Moore, in violation of Moore's constitutional rights, by agreeing to not adopt safer policies and procedures in response to the epidemic of violence at St. Clair, by agreeing to understaff and overpopulate St. Clair, by agreeing to house perceived danger-prone inmates together, by agreeing to not implement or supervise Operation Restore Order, and by agreeing to overlook correctional officers' safety and security failings.

219.  In furtherance of this conspiracy, each of the Supervisory Defendants committed overt acts and was an otherwise willful participant in joint activity. Specifically, the Supervisory Defendants consciously disregarded the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing

112

to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference); and (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference). Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

(a)     Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or

procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)    Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

220.   The Correctional Officer Defendants reached an agreement amongst themselves to act in concert to deprive Moore of his right to be free from unreasonable harm and failed to intervene to prevent harm from occurring to Moore, in violation of Moore's constitutional rights.

221.   In furtherance of this conspiracy, the Correctional Officer Defendants committed overt acts and were otherwise willful participants in joint activity. Specifically, Defendants Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (a) allowed Williams to freely travel between N and O blocks; (b) failed to search Williams for weapons; (c)

allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (d) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (e) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (f) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

222.   Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## Count VIII
## Wantonness
(Against All Defendants)

223.   As described in more detail in paragraphs 83-112 above (incorporated here by reference), Defendants knew that their failures put Moore at an unreasonably heightened risk of inmate violence given the obviousness of the risk based on the staggering rate of brutal attacks at St. Clair (described at paragraphs 71-82 , which

are incorporated here by reference). Moreover, each Defendant was aware of the substantial risk facing Moore in the following ways:

(a)     Defendant Dunn, as Commissioner of the ADOC, was aware of the monthly reports released by the ADOC reflecting the crippling level of inmate-on-inmate violence at St. Clair. Further, Defendant Dunn received the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) which described in detail the ubiquitous threats of substantial harm to inmates at St. Clair, and specifically in the N and O blocks. Defendant Dunn was also on notice of the substantial risk to Moore based on the litigation in which he was involved, including a settlement to which he was a party in the *Duke v. Dunn* case (described more fully at paragraphs 84-90, 94 and incorporated here by reference). Defendant Dunn further has made statements regarding the violence at St. Clair and throughout the ADOC (described more fully at paragraphs 91 and 92 and incorporated here by reference). Finally, Dunn instructed his subordinates to implement Operation Restore Order in response to the above notice, reflecting Defendant Dunn's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(b)     Defendant Daniels, through his role as Associate Commissioner for Operations and Institutional Security in charge of staffing and security, knew of the substantial understaffing issues and resulting lack of control therefrom. Further, on information and belief, Defendant Daniels knew of and discussed the EJI Letter and DOJ Report with Defendant Dunn and other ADOC officials (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference). Defendant Daniels was also personally involved in Defendant Dunn's failed Operation Restore Order mission, which was in response to the EJI letter, reflecting Defendant Daniels's knowledge of the pervasive violence and substantial risk (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(c)     Defendant Brand, through his responsibilities of training and developing the ADOC workforce, knew that the correctional officers charged with Moore's safety were insufficiently trained to address the inmate-on-inmate violence. Further, on information and belief, Defendant Brand knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(d)     Defendant Ellington, as Institutional Coordinator for the Northern Region of the ADOC, knew of the substantial inmate-on-inmate violence at

117

St. Clair through (a) his oversight of the prison, including personal visits; (b) his communications with Warden Jones and other St. Clair staff; and (c) being the liaison between ADOC executive leadership and St. Clair. Further, on information and belief, Defendant Ellington knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(e)     Defendant Mercado, as Chief Law Enforcement Officer, knew of the substantial inmate-on-inmate violence at St. Clair based on his investigations of the violent attacks there. Further, on information and belief, Defendant Mercado knew of and discussed the EJI Letter and DOJ Report (described more fully at paragraphs 11, 95-96, 103-110 and incorporated here by reference) with Defendant Dunn and other ADOC officials.

(f)     Defendant Jones, as Warden of St. Clair, personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her staff. Further, Defendant Jones was directed by Defendant Daniels to implement tier rotation, as part of Defendant Dunn's Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), which

reflects her knowledge that there was a security and violence problem at St. Clair. Further, Defendant Jones personally received the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference). On information and belief, Defendant Jones was aware of the EJI Letter (described more fully at paragraphs 11, 95-96 and incorporated here by reference) and discussed it with Defendant Daniels, among others.

(g)     Defendant Pickens personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Defendant Pickens was also aware of the high rate of contraband weapons circulating though St. Clair based on his personal involvement in contraband searches. Further, on information and belief, Defendant Pickens was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant Pickens was aware of the substantial risk posed by the pervasive violence at St. Clair based on his discussions with Warden Jones, including regarding Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference), for which he was assigned to St. Clair.

(h)      Defendant Estelle personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Estelle was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Estelle was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Estelle's housing classifications played a substantial role in creating those "hot bays."

(i)      Defendant Brooks personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Brooks was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Brooks was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore

Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(j)     Defendant Malone personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant Malone was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Defendants Jones and Pickens, among others. Defendant Malone was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Defendant Malone was also aware of the substantial risk of inmate violence at St. Clair from the "hot bays," as Defendant Brooks authorized dangerous inmates to be concentrated in the "hot bays."

(k)     Defendant Graham personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through her presence at the facility and communications with her subordinates. Further, on information and belief, Defendant Graham was aware of the DOJ Report (described more fully at

paragraphs 11, 103-110 and incorporated here by reference) through her discussions with Warden Jones, among others. Defendant Graham was aware of the substantial risk posed by the pervasive violence at St. Clair based on her involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(l)     Defendant White personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair and further personally saw the absent or failing safety protocols at St. Clair through his presence at the facility and communications with his subordinates. Further, on information and belief, Defendant White was aware of the DOJ Report (described more fully at paragraphs 11, 103-110 and incorporated here by reference) through his discussions with Warden Jones, among others. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference).

(m)     Defendant Robertson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of

incident reports. Defendant White was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robertson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his suspicion of Williams' involvement in stabbings that Defendant Robertson knew occurred earlier the same day Moore was attacked; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; (3) his knowledge that Williams had not been searched for weapons; and (4) his knowledge that Williams was not assigned to Moore's cell.

(n)    Defendant McLemore personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Further, Defendant McLemore was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

(o)     Defendant Robinson personally observed the pervasive and longstanding inmate-on-inmate violence at St. Clair through his presence at the facility, communications with other correctional officers, and review of incident reports. Defendant Robinson was aware of the substantial risk posed by the pervasive violence at St. Clair based on his involvement in failing to implement Operation Restore Order (described more fully at paragraphs 97-101, 143-146 and incorporated here by reference). Further, Defendant Robinson was aware of the substantial risk of harm posed by Williams to Moore specifically based on (1) his knowledge that Williams had not been searched for weapons; (2) his knowledge that there had been multiple stabbings in the N and O blocks earlier that day; and (3) his knowledge that Williams was not assigned to Moore's cell.

224.   Defendants failed to act to protect Moore from unreasonable danger by consciously disregarding the substantial risk of serious harm Moore faced while housed at St. Clair by (a) failing to prevent weapons and other contraband from entering or remaining in the prison (described more fully at paragraphs 148-158 and incorporated here by reference); (b) failing to alleviate or mitigate the overcrowding of inmates (described more fully at paragraphs 72-73, 111, and 128-129 and incorporated here by reference); (c) failing to address the understaffing (described more fully at paragraphs 72-74, 91-92, and 115-130 and incorporated here by

reference); (d) failing to implement and adopt or oversee the adoption of effective security protocols (described more fully at paragraphs 113-170 and incorporated here by reference); (e) failing to institute effective prison management and training (described more fully at paragraphs 119-130 and incorporated here by reference); (f) failing to appropriately house and classify inmates to mitigate the risk of substantial violence in the "hot bays" (described more fully at paragraphs 166-170 and incorporated here by reference); (g) failing to adequately prevent unauthorized inmate travel between housing units (described more fully at paragraphs 131-147 and incorporated here by reference); and (h) failing to adequately investigate and address inmate-on-inmate violence (described more fully at paragraphs 159-165 and incorporated here by reference).  Moreover, each Defendant consciously disregarded the substantial risk facing Moore in the following ways:

> (a)     Defendants Dunn, Daniels, Brand, Ellington, and Mercado together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair.

(b)     Defendants Jones, Pickens, Estelle, Brooks, Malone, Graham, and White together failed to adopt proper policies and procedures to address (1) understaffing and overcrowding, (2) the flow of weapons from entering and remaining in the prison, (3) inadequately trained prison personnel, (4) improper housing and classification procedures, and (5) inadequate security protocols. Further, these Defendants failed to take reasonable steps to ensure that any policies or procedures they did adopt were adequately implemented (or implemented at all) by their subordinates at St. Clair. These Defendants additionally disregarded the procedures set forth in Operation Restore Order.

(c)     Defendant Robertson, McLemore, and Robinson consciously disregarded the substantial risk to Moore when they (1) allowed Williams to freely travel between N and O blocks; (2) failed to search Williams for weapons; (3) allowed Williams to remain in Moore's cell despite knowing there had been a spree of stabbings earlier in the day; (4) allowed Williams to remain in Moore's cell despite knowing he was not assigned to Moore's cell or cell block; (5) disregarded St. Clair lockdown procedure by allowing Williams to remain in Moore's cell when he was not assigned there; and (6) failed to respond promptly to Moore's emergency button press, his cries for help, and other inmates' calls for help. Further, these Defendants consciously disregarded the substantial risk of harm to Moore when they consistently

failed to follow St. Clair security protocols and procedures and failed to adequately oversee and control inmates during their shifts.

225.   The above actions demonstrate that the Defendants acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

226.   These Defendants' misconduct directly and proximately caused the serious injuries Moore suffered from Williams' attack, including at least twelve stab wounds, lingering injuries to his knees, eyes, and face, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kelvin Moore prays for judgment as follows:

A.   An order declaring that all Defendants' acts or omissions, described herein, violated the Eighth and Fourteenth Amendments to the United States Constitution;

B.   Compensatory damages against all Defendants jointly and severally in their individual capacity in an amount to be determined at trial;

C.   Punitive damages against all Defendants in their individual capacity in an amount to be determined at trial;

D.   Reasonable costs and attorneys' fees, including fees in accordance with 42 U.S.C. § 1988 and any other applicable law;

E.      Pre- and post-judgment interest as allowed by law;

F.      An order requiring Defendant State of Alabama to pay any judgment for compensatory damages entered against the Defendants, as well as the associated attorneys' fees and costs; and

G.      Any other relief this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted this 20th day of April, 2021.

/s/ *Chris Burkhalter*

Chris Burkhalter (State Bar No. 1136T65U)
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, TX 75201
Telephone: (214) 972-1770
Facsimile: (214) 972-1771
chris.burkhalter@kirkland.com

Kristen S. Cross (State Bar No. 3465S82K)
Joshua L. Hornady (State Bar No. 0480A36H)
SIROTE & PERMUTT, PC
2311 Highland Avenue South
Birmingham, AL 35205
Telephone: (205) 930-5100
Facsimile: (205) 930-5101
kcross@sirote.com
jhornady@sirote.com